Okay, the next case is number 151460, AstraZeneca AB against Mylan Pharmaceuticals. Mr. Clement, please continue. Thank you, Your Honors. I'm going to start, if it pleases the Court, I'm going to try to start with general jurisdiction once again and see if I get any further this time. I do think that, as was suggested in the prior argument, the other sides, I think their only colorable argument, frankly, because I think it is so clear that the only voluntary conduct that we engaged in is doing business in Delaware. I think it is so clear after Daimler that to do less business than the substantial and continuous amount of business that Justice Ginsburg said for the Court was insufficient in Daimler. I mean, that's what's involved here. But Daimler never had the opportunity to address consent via registration, correct? Completely agree. Completely agree. California, they interpret their consent statute differently, right? Sure. But I think my submission is it cannot be true. Let's put the precedents, the Penoyer era precedents to one side for a second. I don't see how it can possibly be true that if you were looking at this as an initial matter that you would allow Delaware to accomplish in two steps what California could not accomplish in one step. Well, isn't there, because there's a difference between doing a consent analysis and implied, an actual consent analysis and implied consent analysis, isn't there? And I think that if you're going to do an actual consent analysis, not a fictional consent, but an actual consent, then you have to be looking at the voluntary conduct. And the voluntary conduct here was simply doing enough business in Delaware to trigger the registration requirements. And we know, I think, from Daimler that simply doing a modicum of business, what you need to do to register in Delaware, is substantially less than the substantial and continuous pattern of business that the court in Daimler said was insufficient for general jurisdiction. I'm sorry. I think I'm having a hard time following your connection between amount of business and the consent question. Assume for a minute that Delaware, through its statute and state Supreme Court, had made perfectly clear that if you sign this paper, this is what you consent to, and then you sign the paper. Why is that not enough? The paper being the registration, at least. Well, I think the question would be, then, what makes you sign that piece of paper? If you just did it voluntarily, then I suppose I would agree with you. But if there's a different Delaware statute that says, and to do any business in the state, you must sign the paper, then I don't think it's voluntary. Then the only voluntary conduct is the decision to do business in the state. And that's why I think that's what you have to focus on. And I think that is exactly what you have here. Delaware says that if you want to do any business in our state, then you must register. And as part of that registration process, you must appoint an agent for service of process, which we will deem opening you up to general jurisdiction. But why, for due process purposes, is that not a voluntary act, choosing to do business in the state? It is. But it's not one that I think is consistent with the Supreme Court's due process jurisprudence, which is to say, I don't think, and this is why I don't think the unconstitutional conditions argument is really a distinct argument, I don't think consistent with minimum context and due process analysis, a state can condition you doing business in the state on opening yourself up to all-purpose jurisdiction. Because that's exactly what California tried to do. I mean, they didn't do it through the guise of a registration statute, but they basically said the way we interpret our long-arm statute, if you do substantial continuous business in our state, then you are going to be subject to all-purpose jurisdiction. We think that's consistent with due process. The Supreme Court said, no, it's not. Minimum context is the test. The minimum context test focuses, I think it's fair to say, in Justice Ginsburg's view in Daimler, is principally going to direct you to specific personal jurisdiction. But where it doesn't, and where you have general-purpose jurisdiction, you're going to get it in two places, where the corporation is incorporated and where its principal place of business is. And I think the only obstacle to that conclusion would be these Panoia-era cases. And with all due respect to Mr. Olson, what I imagine what Mr. Chamdegian will say, those cases, you don't have to overrule them. The Supreme Court's already done that for you in International Shoe, in Schaefer, and in Daimler. On multiple occasions, they have told, and I think they are telling the lower courts, they're not just talking to themselves. They are saying that to the extent there are decisions from the Panoia era that are inconsistent with minimum context, international shoe analysis, they are overruled. Can I just add, you've read these more recently than I have. Do any of those cases in talking about context and so on, connect to a notion of voluntariness? Yes. Yes, I think all of them, frankly. That's the crucial connection you're making, right? Yes. You're saying that consent, which has to be voluntary, can't really constitutionally be said to be present if what you're giving up is sufficiently unconnected to the, you know, is disproportionate or something. None of the, what shall we call it, international shoe era cases make that connection, do they? Well, I might have missed something. I think they all do, because they all talk about- how something is not voluntary in terms of a consent, an eyes-open consent as opposed to voluntarily directing your conduct. Well, so maybe I'm missing it. They all talk about purposeful availment, which I take to be voluntary conduct. So for the same reasons that I think that the compulsory consent that Delaware imposes is both an oxymoron and not something that gets them out of the due process problem, I also think for the exact same reasons that the statutorily mandated notification letter is not purposeful availment, because it wasn't voluntary. We didn't send the letter to Delaware in the AstraZeneca case because we really like Delaware or we thought, you know- But was your registration voluntary? What's that? Was your registration to do business, well, isn't that- maybe I'm confused. It was not voluntarily- You're taking the act of registering to do business with eyes open about what the consequences of that were. That act was not voluntary. Okay, so let's forget about the letter, the sending of the letter. Okay, but- You have to establish something in Supreme Court post-Pennoyer era due process cases that says something about why you can characterize that eyes-open choice as involuntary. Is that right? Well, I think we're mixing- I may not just be understanding the question. I don't think there's any question that that act wasn't voluntary. So if you're asking me now, if we're past that threshold and you're now asking me to point to the case law that says that that's- There's no question that your signing of the registration form, knowing what that meant- Was not voluntary. That was not a voluntary act. There is a Delaware statute that says if you do business in the state, you must register or face penalties. Right, and you can choose not to do business in the state. So how is that not voluntary? What was voluntary was our decision to do business in the state. What was not voluntary was our decision to register once we did. Okay, but let's assume I want those two things to be the same thing. Since you know you can't do business without registering. You then make a single choice to do business and register. You know what the consequences of that choice is. It's a voluntary choice. No? I suppose if you want to marry them up, but I think we get to impose a due process objection and say, no, that's not the way the world works. We make a voluntary decision to do business. It is a distinct decision. That's voluntary. I'll grant you that. But once we do, the state forces us to register. So I think those are distinct acts. I think the decision for them to force us to register and then have the consequence be opening us up to all-purpose jurisdiction, I think there are two complementary ways of looking at it. One is, and I suppose this might be more of almost like a facial challenge, would be to say that that's just not a condition they can impose. But I think the more natural way to look at it. Because this is not a facial challenge to a statute. You went in to Delaware knowing what the statute was, knowing how it had been interpreted by the Supreme Court, in fact, had been interpreted for many years by the Supreme Court that way, and chose to do business and register in those circumstances. You have not brought a facial challenge to the Delaware statute. You're right. And that's exactly where I was going, which is, I think, the more natural way to proceed in these cases. And I think it's consistent with all the challenges to all the long-arm statutes out there, is you do it as applied. And you basically say, yeah, yeah, sure. You know, you think, I mean, you think you can extend your long-arm statute to everything, but then it's subject to the backdrop of the Constitution. You think that by virtue of us doing even a thimble full of business in Delaware, that you can then force us to register, and then you can then say the consequence of that is that we're open to a suit literally based on primary conduct that took place in Timbuktu. Now, I think the much more logical way to proceed is, whoa, you can say that if you want, and in an individual case, you will test that. And here we have a test of that. And we say, no, the constitutional consequences of our voluntary decision to engage in some business in Delaware cannot be opening ourselves up to all-purpose jurisdiction. And I think that follows directly from the Daimler decision. It's the same voluntary conduct. There was a decision to do some business in California. The case was decided on the premise that it was a substantial and continuous course of business in California. Yet, it wasn't enough. I don't think anybody was- It wasn't enough to get the parent corporation. Wasn't enough to get either. The court- That's not what the Supreme Court said. The Supreme Court said, even if we attribute those acts, you still can't bring the parent in. But it never said we would not allow exercise of jurisdiction over Mercedes-Benz. Well, I guess I thought by the way they treated the agency thing, it would be six of one, half dozen of the other. But I don't think anything turns on that. Which is to say, I think that the holding of Daimler is crystal clear that a substantial and continuous course of business in a state is not enough for all-purpose jurisdiction. But you're saying never, or that you look at the facts and it may or may not be enough. I'm saying that a substantial and continuous course of business- I mean, there's a footnote in Daimler that says you may have exceptional cases. But I'm saying as a general matter, a substantial and continuous course of business is not enough for all-purpose jurisdiction. And the two places that you get all-purpose jurisdiction are where a corporation is incorporated or where its principal place of business is. And if in a case like this, they're both the same state, that's where you sue them. But are you saying that it's inappropriate to consider all of the relationships that we've been told should be considered ever? I think- Or that there would be a point that would cross some sort of threshold that would open the jurisdiction? The way I read Daimler is that as to general jurisdiction- I'm not talking about Daimler. I'm talking about this case. Daimler is an extraordinary, factual situation that isn't close to what we have here. But I think the teaching of Daimler for this case is that as to general jurisdiction, they're really, absent the most extraordinary circumstances, there are two places that you get general jurisdiction. Principal place of business, place of incorporation. In the absence of consent. I mean, it specifically says- Sure, but real consent. If we walked into the suit, as some other generics have, and said, oh, you're suing us here in Delaware under general jurisdiction, or you haven't really specified, well, we're happy to litigate here. That's consent. If we entered a specific agreement with them, and said, we're going to litigate all our disputes in Delaware, that would be consent. Simply doing business in Delaware cannot be a basis- But it's not simply doing business. Wasn't it one of the two Justice Holmes opinions almost continues with the third sentence, following the two that you just said. That is, there would be no doubt that if being sued, you said, happy to be here, that would be consent. So same thing if you say, happy to be here when you enter the state by registering to do business. I mean, the court, through Holmes, expressly tied those two things together. Sure, in the Penoyer era, when territorial jurisdiction was everything, so the court had to do somersaults in order to figure out how to get somebody within the territory. But the Supreme Court, on repeated occasions, has already said, those are the fictions that were discarded in international shoe. And the Supreme Court, I don't think, I don't know how they could be much clearer. International shoe itself says that those prior Penoyer cases, to the extent they're accurate, they can be conceptualized as minimum contacts cases. Perkins specifically says, which they think is their case, and I disagree with them, Perkins specifically says at one point that when you're dealing with a requirement from a state that you must license and appoint an agent, get a license and an agent for process to do business in the state, that that is not conclusory, that that is not outcome determinative. Perkins says that. And so that's. But wasn't that because it was not clear in advance of your appointing of the agent what the consequences would be? No, I don't think. There's nothing in that part of the opinion that suggests that. And as I read that opinion, that's one sentence in context. But I think it doesn't say there's any ambiguity there. So the Perkins case, I think, is helpful to us. They want to rely on footnote six in the Perkins case and the fact that it cites the Pennsylvania fire case, which I think is their best case. I think that's the Holmes case you were referring to. If you look at footnote eight of the Daimler opinion, it specifically tells people not to rely on footnote six of Perkins. It's the same cases. I mean, in that case, it was the Barrow case. In this case, it's the Pennsylvania fire case. It's Schaefer against Heitner in footnote 39 where the court doesn't say that the Panoia era cases are in thin ice or may be reconsidered at some point. It says they are overruled. When Justice Scalia, for four justices in the Burnham case, talks about the Panoia era fictions, one of the fictions he specifically identifies is the idea that a corporation consents by registering and appointing an agent of process. And he says those fictions were done away with with international shoe. This is not a case, whatever you think about Sherston-Lehman and the reluctance of lower courts to overrule the Supreme Court decisions for them, the Supreme Court has done the overruling. And it's told courts. I think we're just going to retrace our steps. But what is fictional about signing the registration on the assumption that you knew exactly what that meant as opposed to just appointing an agent? And then it's easy to see how one can say it's a fiction to say, oh, that means you consented to something that you actually didn't have staring you in the face. But here, I don't think you dispute. You had the Delaware Supreme Court decision saying, this is what this means. And you signed it anyway. That's not fictional. What is fictional is that that is voluntary consent. If you put a gun to my head, I will sign anything you want me to. And you can say, well, you consented to it. You signed. But the fact that you had a gun to my head made it not voluntary consent. And I think what matters when it comes to waiving constitutional rights is voluntary consent, not having a state law that says that you must register under these circumstances. And what gave rise to the registration obligation, and you're right, we're retracing our steps. But what gave rise to it was exactly what Daimler said is not sufficient for general purpose jurisdiction. Let's hear from the other side. Thank you, Your Honor. Mr. McClemmon, we'll save you a little time. Mr. Shanmugam. Thank you, Judge Newman. Kenneth Shanmugam of Williams and Connolly for Appley AstraZeneca. May it please the court, in these cases, Mylan is really seeking to upend the settled understanding that brand name drug manufacturers may bring consolidated patent infringement actions against generic manufacturers in a single jurisdiction, such as Delaware, as long as the exercise of jurisdiction is fair and reasonable. I'd like to start, if I may, with the first of the two bases for jurisdiction here, specific jurisdiction, both because that was the first basis in our briefs in this case, but also because I think that that's really the only issue that this court needs to resolve in order to dispose of the case if it decides to do so in our favor. When you say it's a settled understanding that's being upset, it's not settled in the courts. It's settled, I mean, parties have been doing it, but that doesn't mean that there's ever been an opinion that analyzed it from a jurisdictional standpoint. Not from this court, to be sure. I think the lower courts overwhelmingly have held that there is personal jurisdiction. And quite frankly, the issue had not really been litigated all that often prior to Daimler, and quite frankly, prior to Mylan raising this issue in a number of different cases. But let me sort of start with specific jurisdiction because, again, I think that that's the narrower of the two potential grounds here. I think it's important to underscore at the outset that specific jurisdiction, unlike general jurisdiction, is a claim-specific inquiry. In fact, you can have specific jurisdiction over some claims in a case and not others. And therefore, it really is essential to take a look at the claimant issue. And of course, the claimant issue here is a claim for the so-called artificial act of infringement under Section 271E2. And I think that the language of that provision is actually quite instructive. The language of that provision says, and I'm quoting,  to submit, A, an application for a drug claim and a patent. And I'm going to omit some of the irrelevant language here. If the purpose of such submission is to obtain approval to engage in the sale of a drug claimed in a patent before the expiration of such patent. And I think what that really tells us is that what Congress did here is to define an intentional act of patent infringement. And I'll come back to the Article III implications of that in a minute. And that act causes injury wherever the generic manufacturer seeks approval to market and sell its competing product. Where does the act occur? Regardless of where it causes injury, let's start with where it occurs. Well, so I think it is certainly true that the ANDA is prepared somewhere, and it is then transmitted to the FDA. And again, we know from Zeneca that the mere act of transmission to the FDA does not constitute a cognizable contact. But I think that the critical point, Judge O'Malley, and you'd raise this in the earlier arguments, is that under the Calder versus Jones framework, the framework that governs personal jurisdiction when you're dealing with intentional torts, the analysis doesn't simply focus on where the act takes place in isolation. It focuses on where the act is directed or aimed. And again, our point here is that the act is directed or aimed essentially everywhere where the patent holder has rights. And to get back to the Article III implications of this, which I think tie into this point, I don't think that this is a case where Congress- Everywhere where the patent holder has rights or everywhere where the applicant plans to market and to sell the drug. And everywhere that the applicant- and I should have added this important point- and everywhere where the applicant is attacking those rights. And so just to be clear, our argument doesn't depend on where the- You changed the word, I think, because you had some thought in the middle of your sentence. Attacking those rights is different from selling something that will take sales away from the one who has the rights. I think it's sort of a fine, conceptual distinction. But I think- But injury, in fact, is not fine and conceptual. It's real. Well, and just to be clear about what the injury is here, I think that the injury here, as Judge O'Malley suggested implicitly in one of her questions, is an immediate injury to the value of our patent rights. Because those rights are being called into question by the filing of the ANDA with the Paragraph IV certification. And so in other words, this is not a Spokio-type case in which it is Congress sort of creating the Article III injury by statute. Why do they have a stake in the resolution of validity of your patents? Well, for the simple reason that they are the ones calling the validity of the patents into question. And you are right. Their stake- Why do they have an Article III stake? They obviously want to, they as the defendant in the case that we're now bringing, obviously want to market and sell the competing product. And Judge Tronto, to get back to one of your other questions, I think it is certainly true that an ANDA applicant doesn't ordinarily, and certainly based on our knowledge, doesn't ever sort of say in an ANDA application, we're going to sell this product in particular locations. But I think it's implicit in the statutory scheme that what the applicant- I just want to clarify that. Doesn't ANDA applicants say, we plan to sell the thing that we're seeking approval for? Not in hyperbole, but I think that's Because what they're seeking from the FDA is nationwide approval. And so the reason why I think this fine distinction is important is because our argument here doesn't turn on the reality of where or even whether Myelin is going to sell its competing product. Though I would note parenthetically that, I mean, look, there can't really be any serious doubt that if they get approval, they're going to sell the drug nationwide and sell it through established distribution channels, presumably including into Delaware. Our argument turns on the nature of the act of infringement. And again, what they're seeking is nationwide approval. This is where I sort of understood you were drawing a distinction between the arguments you're making and the arguments that were being made on behalf of Porter, is that, as I understood your reliance on Calder, your view is that it doesn't matter where they're going to sell, just the mere fact that they've asked for approval and that the Article III injury is much akin to the analysis we would do if, in fact, Myelin brought a DJ action seeking to invalidate your patent for purposes of whether or not there is enough threat. Yes, and just to be clear, I don't think that there's really any daylight between our position and the position that Mr. Olson was articulating when he was up here a little while ago. We certainly think that the fact that the sales are, in fact, going to take place nationwide tends to confirm that there's nothing inequitable about nationwide jurisdiction. And we, as does Accorda, have a fallback argument here that there are additional Delaware-related contacts here. But frankly, we think that- But your Calder analysis really turns on the fact that once there is an act of infringement, then you have the effects analysis, and that it is akin to defamation. That is absolutely correct. And just to be clear, we think that that is the appropriate way in which to resolve this case. And of course, this Court's decision in this case is going to have implications not just for R2 cases with their specific fact patterns, but to all of the other cases out there arising under the Hatch-Waxman Act. We think the correct analysis here is that there are effectively nationwide contacts, again, subject to the limitation that the exercise of jurisdiction must be fair and reasonable. And importantly, that analysis under the Supreme Court's decision in Burger King takes into account factors such as the burden to the defendant. But do we have to find that there would be jurisdiction in every single state in which they sought approval? Because if we're trying to say, is this Walden or is this Calder, then wouldn't you have to have the overlay of the effects as well? I mean, the effects are relevant to the jurisdictional analysis. But either way, but what the Supreme Court said in Walden is you need more than just effects. Correct. But you need them nonetheless, right? Well, which is to say that you are focusing on the defendant's conduct and where the effects of the conduct are felt. And sure, effects are insufficient. And the reason why we think that Walden is not the applicable framework here, and we really think that Walden is an exception to Calder rather than vice versa, but however you doctrinally slice it, the reason we think that Walden is irrelevant is that here you have conduct that is purposefully targeted not only at Delaware, but everywhere. Again, it's targeted everywhere that we have patent rights and where they are seeking approval to market and sell a competing product. And at one point- Are you saying that the issue before us goes beyond this particular case? Well- Or whether they were properly sued in Delaware? Well, Judge Newman, I think this- Are there lines to be drawn if we- you're saying that they need to be drawn? This court, Judge Newman, certainly could say that there are sufficient contacts, idiosyncratic to these two cases, to support the exercise of jurisdiction in Delaware. And in particular, in our case, because the notice letters, which were after all integral to the entire scheme, were actually sent to an AstraZeneca affiliate in Delaware. But of course, there are lots of these cases in which Milan is raising this objection. And I think it would be important for this court to provide guidance to the lower courts, not least because what we're really talking about is the question of, what are the contacts at issue in cases of this variety? And again, we think that the principal relevant conduct here is purposely targeting our patent rights everywhere and seeking approval to market a competing product everywhere. And that makes us no different from defamation. And the one other thing I would say on this issue- When you say everywhere, so that means that the suit could be brought in any state, that it didn't matter that you were incorporated in Delaware? Yes, but subject to the important limitation that the exercise of jurisdiction has to be fair and reasonable. And so if we decided to bring suit in Alaska, I think Milan could colorably argue that it would be very burdensome to have to litigate there. And you would engage in the usual analysis, taking into account the multiplicity of Burger King factors as to whether or not the exercise of jurisdiction is appropriate there. I want to say just two other quick things on specific jurisdiction, and then turn in my remaining time to general jurisdiction. Mr. Clement said at the outset of his argument that the fact that our position on specific jurisdiction could give rise to nationwide jurisdiction gave him pause. But I would respectfully submit that there's actually nothing odd about that. As Mr. Olson said during his argument, of course, once a product is brought to market, it happens all the time that there is effectively nationwide jurisdiction. And so if I market a smartphone and sell it nationwide, and Apple thinks that I'm infringing their patent rights, of course, there's nationwide jurisdiction. And in fact, as this court will be aware, there are a number of federal statutes that effectively, affirmatively confer nationwide jurisdiction, such as the securities laws, and Civil RICO, and the Sherman Act, which by virtue of their nationwide service of process provisions, effectively give rise to nationwide personal jurisdiction. I think on the flip side, with regard to Hatch-Waxman, sure, it's true that Hatch-Waxman itself does not contain an express jurisdictional provision. But I think our position, and not Mylan's incredibly stingy position, under which you would simply, quote unquote, often have jurisdiction where the and it is prepared, whatever that means. I think that our position is much more consistent with Congress's intent. Because in the Hatch-Waxman Act, Congress wanted these cases to be resolved in an expeditious fashion. And indeed, although Mr. Clement relies on the House report to the Hatch-Waxman Act, I think the best evidence of Congress's intent comes in section 299 of Title 35, a provision that was added in the America Invents Act. That's a provision that, of course, cut back on consolidated proceedings against multiple defendants in an effort to control problems with non-practicing entities, but which specifically carved out Hatch-Waxman cases from the requirements for obtaining consolidation. And I think that that's the best affirmative evidence that Congress wanted these proceedings to be resolved in a consolidated fashion, again, consistent with Congress's intent. But why wouldn't 1407 be good enough for that purpose? Well, because I think that it would create incredible complications by virtue of the operation of the 30-month stay provision. As our brief and the amicus briefs point out, the MDL process, of course, introduces inevitable delay. And in addition, you have the problem that would arise because, of course, these cases, if they're tried, are going to have to be tried in the various jurisdictions in which they were initially brought. And you have the very real problem of the potential for inconsistent judgments and, of course, the implications of those inconsistent judgments for both the 30-month stay provision and for this court's quarterly review. Yeah, but the judge, I mean, maybe this is going too far afield, but the MDL judge, since these are bench trials, could be cross-designated as a judge in all the other jurisdictions. I think that would require the consent of the parties or at least some creative activity on the part of the district courts in order to facilitate. Well, no, it's not. I mean, having been an MDL judge and have been designated in other districts for purposes of trying cases, you simply have to go through the appropriate processes in order to get the committee on the multi-district litigation to designate you. That's it. Yeah, well, but as Your Honor will know, the very fact of designating an MDL judge itself typically takes a period of some months. And again, I think that Congress's priority in the Hatch-Waxman Act was on the efficient resolution of these cases. And again, I think the best evidence of Congress's intent on this score is not a House report, a piece of legislative history, but rather Section 299, which seems expressly to contemplate consolidated proceedings. Since I have a minute left, I want to say just a word about general jurisdiction, if I may. I think that this is not simply a case in which this court is bound by the Supreme Court's prior jurisprudence. This is a case in which there's simply no indication that the Supreme Court today would deviate from those earlier Supreme Court cases. On the issue of consent, I think that it is sufficient here that Mylan voluntarily chose to do business in Delaware. But I think it is also true that in 2010, for whatever reason, Mylan took the additional voluntary step of electing to register in Delaware, when it could have simply chosen instead. Well, the voluntary step was so that it wouldn't be a violation of Delaware law. But as Judge O'Malley, you pointed out earlier, it would have simply had to endure relatively modest consequences, including a $500 fine if it had refused to do so. But I think that I'm content to rest on the fact that its decision to do business in Delaware was itself a voluntary act. And that is really all that is required. And I think if you would expect a responsible corporation to say, I'm going to comply with the law, regardless of what the penalty is. Well, I can't speak to why Mylan decided to register in 2010. I am not aware of any dramatic change in Mylan's business model that took place then. And I assume that Mylan was doing business before 2010, much as it was doing when it decided to register. But I think that the critical fact for purposes of this discussion is that not only do we have the pre-International Shoes Supreme Court decisions, we have a litany of subsequent Supreme Court decisions that not only cite Pennsylvania fire insurance and other cases in that line, but that draw the distinction between actual consent and implied or fictitious consent in exactly the way that we're drawing it. And that put this type of consent on the actual consent side of the line. And the two cases I would point this court to, which are cited in the briefs but may be lost in the shuffle, are first the Olberding case, which was the case involving the question of whether a driver impliably consented to Kentucky jurisdiction and therefore to venue by driving through the state. And that's 346 US at 340 to 342. And then second and critically, the Insurance Corporation of Ireland case at 456 US at 704. And to be sure, as Mylan points out in its reply brief, that case catalogs a number of different types of cases in which there could be consent, cases in which a party voluntarily agrees to the jurisdiction of a particular court, for example. But in the one category of cases that Mylan conspicuously omits, pages 9 to 10 of its reply brief, it says that the court has upheld state procedures which find constructive consent in the voluntary use of certain state procedures. And of course, that's precisely what's going on in cases such as Pennsylvania fire insurance. And if I could, with the court's leave, just say one word about the two kind of collateral issues that are floating around with regard to general jurisdiction. First, the unconstitutional conditions argument, and then the commerce clause argument. Judge Toronto, I also, like Mr. Clement, really don't think that there's a lot of daylight between the straight-up question of constitutionality and the application of the unconstitutional conditions doctrine here. But it's perhaps for a slightly different reason. I think all of these personal jurisdictions. I should say, I'm not sure which way the absence of daylight cuts here. I think it probably cuts in our favor, for the reason I'm about to say. And in a minute, Mr. Clement can disagree with me. I think it cuts in our favor because I think that the Supreme Court has made clear, and it's clearest in Insurance Corporation of Ireland, that the reason that we have this doctrine, the reason we have a due process limitation on personal jurisdiction, is because of individualized considerations of fair notice. And so I think in a case in which a party is consenting, the party is on fair notice of the implications of its action. And so the due process interest, in some sense, has therefore been served. And I think it is also true, as Mr. Olson pointed out, that in addition to the fact that any separate alliance on the unconstitutional conditions doctrine here has been plainly waived, the Supreme Court's decision in NIRBO, I think, really sort of essentially deals with an unconstitutional conditions style argument. Because in NIRBO, of course, the Supreme Court distinguished cases such as Pennsylvania fire insurance from the Southern Pacific case, the primary case on which Mylan's amicus relies, in which you had a state saying, if you consent to do business here, you're going to lose your right to remove cases to federal court. And the court said, that statute is invalid, whereas the statute at issue in Pennsylvania fire insurance is valid. And while the Supreme Court back then wasn't really talking as explicitly in terms of unconstitutional conditions, because that doctrine was a relative babe at the time in constitutional law, I think that that decision essentially rejects that style of argument. What about Mr. Clement's point that that's because at the time, the Supreme Court was talking more about the dormant Commerce Clause issues and not really focusing on the due process? Well, I think that that's true with regard to Bendix. And I do want to say a word about the Commerce Clause. I think that is also an argument that has not been raised by Mylan here. And I heard Mr. Clement essentially concede that the thrust of his challenge here is a due process claim rather than a Commerce Claim. And I really think that a Commerce Clause challenge would really be appropriately brought as a facial challenge to the Delaware statute. But I think interestingly, Judge O'Malley, if you take a look at the Sternberg case, which is, after all, the Delaware Supreme Court case that construed the Delaware statutes as providing for consent by registration, Justice Holland, in his opinion for that court, addressed, and I think addressed quite learnedly, the dormant Commerce Clause argument. And said the burden was not undue. And said that the burden was not undue and distinguished the Bendix case, which is a case that neither Mylan nor its amici rely on, but which I think is really sort of the closest case. It distinguished that case on the grounds that the burden was not as substantial. And I really do think that the question of whether or not this statute is consistent with the Commerce Clause would be governed by Pike versus Bruce Church balancing. And in addition to the fact that the burden is relatively slight, I think Delaware's interest in having a statute of this variety is simply in putting out-of-state corporations on the same footing as in-state corporations would be on, including subjecting them to the jurisdiction of the court if, say, the contacts are insufficient to give rise to specific jurisdiction. And so if you had a company, for instance, that put a product into the stream of commerce and, unlike Mylan, did not use established distribution channels, that company might be able to argue that there's no specific jurisdiction over a product liability suit. But the effect of their consent would be to subject them nevertheless to the jurisdiction of the Delaware courts if their product ended up injuring a Delaware consumer. So I don't think there's any. Is it, I mean, do you think that it's relevant at all that at the time these cases were first decided, that there were very few corporations that were doing business in every single state in the union? I mean, that was a situation where you chose a few states to do business in, and so that it made more sense to allow the states this kind of flexibility. Well, of course, the irony, Judge O'Malley, is that International Shoe, far from narrowing the scope of jurisdiction, actually broadened it, in part, to respond to the economic realities that people were increasingly moving nationwide and corporations were increasingly doing business nationwide. And International Shoe really added this notion of minimum context to the jurisdictional mix to afford a mechanism for providing jurisdiction over out-of-state corporations. And Mr. Clement makes the argument, particularly in his brief, that this is somehow going to gut the rule of Daimler. But I think that the practical reality is that notwithstanding the fact that Pennsylvania fire insurance is soon going to be celebrating its 100th anniversary as a Supreme Court decision, we have not seen a flood of state statutes requiring consent as a condition of registration. I think that I'm aware of only seven states where the state statutes have definitively been construed in that fashion. There are, if anything, a greater number of state statutes that have expressly been construed to go in the other direction. Now, of course, even if there were such a flood of cases, I don't think that that's any reason to think that the earlier Supreme Court decisions should not be followed. And indeed, even Daimler itself, as Mr. Olson pointed out, preserved consent as an alternative basis for general jurisdiction. And I would note, parenthetically, in response to one of your earlier questions, Judge O'Malley, that California is a state that does not have a jurisdiction by registration statute. The California courts have definitively construed the registration statute not to permit that. So that issue was not on the table. But even in Daimler itself, the court was careful to make clear that consent remained an alternative basis for jurisdiction. With the response to the argument that there's a difference between consent and coerced consent. Well, I don't think that even the Warren Court would have viewed this consent as involuntary. I mean, with all due respect, this was an express act of registration. And again, of course, a voluntary act to do business in the first place. And at a minimum, where the state statute requires a separate affirmative volitional act that is directly related to jurisdiction, whether that act is registration or the designation of an agent, I think this clearly falls on the actual consent side of the law. And I think you may have said something quickly in passing a few minutes ago. But what exactly is Delaware's interest in saying if you want to do business here, you must subject yourself to our courts for matters that have nothing to do with our state? Well, I think in fairness first, that Judge Strato, you could have a case in which you simply don't have sufficient minimum contacts to give rise to specific jurisdiction. But yet, the state could very much have an interest in providing a remedy for in-state residents. And so a case would be a case in which a general jurisdiction, which is what Sternberg says you consent to, can be a, what's the language, entirely transitory cause of action. The plaintiffs don't have to come from Delaware. The defendant doesn't have to come from Delaware. The action, the conduct, that issue doesn't have to have anything to do with Delaware. Yet, what is Delaware's interest? It certainly is true that the statute might sweep somewhat more broadly. And so it does provide a remedy potentially for out-of-state residents, as well as for in-state residents. So what's Delaware's interest in doing that? Well, I think that Delaware's interest may not justify the entire sweep of the statute. But I think that at a minimum, it is appropriate for Delaware to make the legislative judgment to say, essentially, we are going to put out-of-state corporations on a level jurisdictional footing within state corporations. And that's all that this consent does. And of course, that's precisely what the consent at issue in cases such as Pennsylvania fire insurance and Robert Mitchell furniture did. Of course, the whole point of the consents there was that they gave rise to general jurisdiction. And the Supreme Court said that there's nothing problematic about that. And my point, I think, was simply in response to Judge O'Malley's question about how a court would look at a commerce clause challenge. That, thankfully, is not one of the issues before the court here. We think that this court can affirm the decisions of the lower courts in these two cases solely on the basis of specific jurisdiction. But at a minimum, the court ought to address the issue of specific jurisdiction. And it certainly would be appropriate, if the court chose to, to go on and address the issue of general jurisdiction as well. But our primary argument on specific jurisdiction, our argument that what a generic manufacturer is seeking to do here, is to essentially declare nationwide war on the rights of a brand name manufacturer. That is a sufficient basis for resolving these cases. It would provide for contacts nationwide, but again, subject to the important limitation that the exercise of jurisdiction in any particular case must be fair and reasonable. And on that basis, we would submit affirmance should be required. I'm going to ask one more question. One more. And we need to wrap it up. OK. With respect to the issue of specific jurisdiction, there seems to be a little bit of a divergence in terms of the two arguments that perhaps you both make. And that is that we can look at expressed desires to engage in future conduct. As to that prong of the argument, it seems that the only cases you cite are contractual cases, where there's a contractual obligation to engage in future conduct. Here, even though they're seeking approval to sell, they may never sell in certain of those jurisdictions. Right. Isn't that a distinction, at least as to that prong of your argument, rather than the prong that says the harm is occurring because of the pull on the patent? Well, I don't think there's really any sort of daylight there. But I think you've sort of fairly characterized our argument, which is to say that our argument does not depend on where the sales are ultimately going to take place. It turns on what it is that the generic manufacturer is seeking approval to do. And the generic manufacturer is seeking nationwide approval. And under the framework of Calder versus Jones, which is the framework that governs intentional torts, we think that this is no different from a case involving, say, defamation. Now, yes, it is true that by virtue of the nature of the tort in a defamation case, in both the Calder case and the Keaton case, you had the nationwide publication of the defamatory material. And in the Keaton case, you had jurisdiction even in a jurisdiction where the plaintiff was not resident by virtue of that nationwide publication. But here, again, the act in question is this sort of nationwide declaration of war. It is the fact that the generic manufacturer is calling into question the brand name manufacturers or the pioneer drug company's rights, wherever those rights are held, and wherever the generic manufacturer is seeking approval to sell the product. And so that's why there may seem to be a sort of slight disconnect here. Of course, the result in either case is the same. If you look to ultimate sales, we certainly think that there can't really be any serious doubt that the ultimate sales here are going to take place nationwide. But again, because this is a claim-specific inquiry, we think you have to focus on what it is that the generic is seeking to do and what the generic is seeking to do under Section 271E2 is approval to market and sell a drug that is claimed in a patent before the expiration of the patent. And that causes nationwide injury, and that certainly suffices to establish nationwide context. Again, with the important caveat that where the exercise of jurisdiction would not be fair and reasonable, and we really don't think Mylon can make an argument to the contrary here, there may be some limitation on jurisdiction. OK. Thank you. All right. Good. Thank you, Your Honors. And that concludes. Well, no, Mr. Clement, you have three minutes, exactly. Thank you. I will. Are you getting tired? I would just indulge you for three points, if I may. First of all, my friend on the other side came perilously close to implying that the Insurance Corporation of Ireland case actually positively cited Pennsylvania Fire in its language about taking advantage of certain state procedures as being a way to waive jurisdiction. The internet, that decision does not. What about a tinker to tailor to chance kind of regulation? But importantly, it doesn't cite Pennsylvania Fire for that proposition. It's just Perkins that cited, what does he say? Well, what the court cites for that proposition is a case that basically says that if you file a complaint, and then you open yourself up to a counterclaim. So that's the kind of state procedures they're talking about. They're talking about the state courts, which is a classic sort of personal jurisdiction waiver. So really, in terms of citing Pennsylvania Fire post-International Shoe, what the other side has is Olberding, which is a venue case, and they have footnote six of the Perkins case. Well, the Perkins text says that a consent statute is not conclusory, and footnote 18 of Daimler says don't rely on footnote six of Perkins. And the last point on that is just the court could not have been clearer, and it's a plurality opinion, to be sure. But in Burnham, they specifically said that these kind of old consent statutes are the fictions that International Shoe did away with. So the second point I'd like to make is that, I mean, my friend on the other side said that the filing in ANDA in a paragraph four certification is the equivalent of declaring nationwide war on the patent. Now, that doesn't seem to be the way that Congress thought about this at all. They thought it was a mechanism to provide some litigation over the issue. And I think it's actually interesting to contemplate what happens if the shoe's on the other foot. I mean, if Mylan were to bring a declaratory judgment action about the validity of this patent, I wouldn't think we could file it in West Virginia just because we thought that was a convenient place to file the suit. And in fact, the Hatch-Waxman Act itself specifically has a provision that contemplates what happens and where to file a suit if, in the relatively unusual event that the patentee does not bring their own declaratory judgment action. And it says that the generic ANDA filer can bring it in the patentee's principal place of business. So Congress wouldn't. In the absence of that provision, why do you doubt that you could bring that in West Virginia? If they sell their drug in West Virginia and you're challenging the validity of the patent that would exclude you from West Virginia? I don't think the fact that they're selling a product that we think is backed by an invalid patent gives us a basis to sue them in West Virginia. I mean, because we don't have a patent in everything that's covered by an invalid patent. I mean, so I don't think it works in reverse. And I think, logically, we would sue them in their home state and they should sue us, logically, in our home state. The point I'd like to finish with is my friend on the other side began by talking about the settled practice of having these cases litigated in Delaware. Well, sure there was a settled practice. But it's unambiguous that the settled practice was based on general jurisdiction. It wasn't based on a consent theory. It wasn't based on a specific personal jurisdiction theory. It was based on the pre-Daimler theory that if you did a decent amount of business, you were there for all purpose jurisdiction. And both of the district courts that you're reviewing today correctly recognize that Daimler was a game changer for that, that Milan was not at home in Delaware. And this court, the other side, doesn't even take issue with that. So their submission is that, lo and behold, business as usual, nothing really changes because of Daimler, because we can also hook Milan and other companies on this consent theory, or we can hook them on specific personal jurisdiction. And with respect, neither of them makes sense. Pennsylvania Fire is going to celebrate its 100th birthday because it is a Panoia-era case that has been long overruled by the Supreme Court. And with respect to specific jurisdiction, I simply do not think there is specific jurisdiction in every state in the nation by virtue of filing an ANDA in Maryland. If that were the case, then this court was profoundly misguided in its Seneca decision, and I don't think that was the case. Thank you for your indulgence. Thank you, Mr. Clement. Mr. Sheldon, the case is taken under submission.